## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **LOYD WATKINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 4:17-CV-461-VEH** |
| | ) | |
| **GOODYEAR PENSION PLAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

## I.   INTRODUCTION

This case arises from an ERISA dispute over the terms of a pension plan (the "Plan"). Before the Court is Defendant Goodyear Pension Plan's ("Goodyear") Motion for Judgment as a Matter of Law (the "Motion"). (Doc. 13). Plaintiff Loyd Watkins ("Watkins") responded to the Motion. (Doc. 16). Goodyear replied. (Doc. 24). Accordingly, this Motion is ripe for review.

## II. Factual Background[1]

The Plan is a "pension plan" as that term is defined in ERISA. 29 U.S.C. §1002(2)(A). The Plan expressly designates the "Pension Board" to administer the Plan:

> The administration of the Plan shall be by a Pension Board of five officers and/or employees of the Company, at least three of whom shall be officers. Members of the Pension Board shall be responsible to the Board of Directors of the Company. The Pension Board shall have the authority to elect its own chairman and secretary and to appoint an administrator of the Plan to whom the powers of the Pension Board may be specifically delegated. The Pension Board may adopt by-laws and regulations for the administration of the Plan not inconsistent therewith. Any act or decision of the Pension Board shall require the concurrence of a majority of its members.

(Stipulated Administrative Record ("SAR") (Doc. 10) at 34).[2] The Plan vests the Pension Board with discretionary power over every facet of Plan administration:

---

[1] The facts set out herein are gleaned, in substantial part, from the facts proffered by the parties. To the extent that a party has proffered a fact which is not disputed, it has been included without citation. To the extent that a fact proffered by a party was disputed by another party, the Court first examined the proffered fact to determine whether the evidence cited in support of that fact actually supported the fact as stated. If it did not, the fact was not included. If it did, the Court then looked to whether the evidence cited in support of the dispute actually established a dispute. If it did not, the Court presented the fact, with citation to the evidence supporting the fact as proffered. If the cited evidence was disputed by contrary evidence, the evidence was viewed, as this Court must, in the light most favorable to the non-movant, with citation to such supporting evidence. If more explanation was needed, the Court included that information in an appropriate footnote. Some facts proffered by the parties, which the Court deemed irrelevant and/or immaterial, may have been omitted. Further, as necessary, the Court may have included additional facts cast in the light most favorable to the non-movant.

[2] The Court uses the Bates style numbering at the bottom, right-hand side of the pages in the SAR. Otherwise, the Court uses the page numbering supplied by CM/ECF.

The Pension Board shall have all such power and authority as may be necessary to carry out the provisions of the Plan, *including discretionary power and authority to interpret and construe the Plan and to resolve any disputes arising thereunder* subject to the provisions of Paragraph 8 and 9 of this Article II and the power and authority expressly conferred upon it herein. The Pension Board shall have authority to grant such pensions or other benefits as are provided under the Plan and to take such further action as it shall deem advisable in the administration of the Plan in accordance with its terms.

(SAR at 34)(emphasis added). The Pension Board and the ERISA Appeals Committee ("EAC") are one and the same body and are interchangeable. (Affidavit of Shawn Breon "Breon Aff." at p. 2, ¶3 (Exhibit 1 of Evidentiary Submission)). Other than the name, there is no distinction between the EAC and the Pension Board. (Exh. 1 at p. 2, ¶¶3-5). They are not different bodies and do not act independently of one another. (Exh. 1 at p. 2, ¶4). The Plan's administrative review process consists of two levels: the first level of review is conducted by the "Benefits Review Committee" with the second and final level of review conducted by the EAC/Pension Board. (SAR at 9-10 & 26-28; Exh. 1 at p. 2, ¶¶5-6).

Loyd Watkins, age 86, is a 33 year employee of Goodyear who retired on June 18, 1991. (Doc. 16 at 1 ¶1); (Doc. 24 at 2 ¶1). At the time of his retirement and commencement of pension benefit, Watkins was married to First Wife (Inez Watkins). (SAR at 3-5). Watkins and First Wife signed the "1950 Pension Plan--Notice to Pension Board of Election of Optional Method of Pension Payment"

("Election Form") on June 19, 1991. (*Id.* at 4-5). The Watkins' signatures on the Election Form were witnessed by a Goodyear representative, Bettie R. Williams. (*Id.* at 5).[3] The Election Form sets out five options (i.e., Options A, B, and C, Special 50% Joint and Survivor Option, and No Option) for the retiree and spouse to consider. (*Id.* at 4-5). The chosen option is identified by checking the box that appears next to that option on the form. (*Id.*). On Watkins' Election Form, the box next to "Option B (50%)" was checked on the first page of the form. (*Id.* at 4). No other box was checked on the form. (*Id.* at 4-5).

Option B is the 50% joint and survivor option, which provides a benefit for the retiree's surviving spouse described in part as follows:

> (2) After the first 60 monthly pension payments have been made, a reduced monthly pension shall be payable to me [i.e., the retiree] for life.

> (3) After my death, (but only if my death occurs after the Option becomes effective) my spouse, as Contingent Annuitant, shall receive monthly payments in an amount equal to one-half of such reduced amount as would have been paid to me had I been then living, with such payment to continue during the lifetime of my spouse.

(*Id.* at 4). In the Election Notice at Option B, Watkins designated First Wife as "my spouse". (*Id.*).

---

[3] Watkins argues that "[t]he Plan representative suppressed the Plan provision" at issue, but does not cite to the record. (Doc. 16 at ¶5).

Effective July 1, 1991, Watkins began receiving from the Plan an unreduced monthly pension benefit payment (in the amount of $910.00) under Option B. (*Id.* at 6). In July 1996, after receiving 60 unreduced monthly payments, in accordance with the terms of Option B, Watkins' monthly pension benefit payment was reduced to $773.77 for the remainder of his life. (*Id.* at 4, 6).

On July 1, 1991, when he began receiving his Plan benefit, Watkins was married to First Wife. (*Id.* at 1, 5, 26). First Wife died on August 21, 2014. (*Id.* at 1, 26). On May 25, 2015, Watkins married Second Wife (Bobbie F. Watkins). (*Id.*).

On January 4, 2016, Goodyear received a letter from Watkins requesting that Second Wife be allowed to receive a survivor pension benefit if Watkins predeceased Second Wife. (*Id.* at 1-2). Goodyear's Benefits Review Committee ("BRC") reviewed Watkins' request. (*Id.* at 9-10). Shawn Breon, Goodyear's Manager Benefit Operations, on behalf of the BRC, sent Watkins a letter dated March 4, 2016 informing Watkins that the BRC had reviewed his request to make Second Wife his surviving spouse, and that the request was denied. (*Id.*).[4] In that letter, Breon wrote, in relevant part:

The [BRC] determined that after the death of your spouse, Inez Watkins,

---

[4] As a result of choosing Option B, Watkins's pension was reduced $136/month for life and remains at a reduced level, even though the contingent beneficiary provision is not available to his current wife. (Doc. 16 at ¶13); (Doc. 24 at ¶13).

no survivor pension benefit is payable to your current spouse, Bobbie, because you were not married to Bobbie on July 1, 1991[,] when your pension payment commenced.

. . .

You retired from Goodyear-Gadsden under the 1950 Pension Plan on July 1, 1991. At the time of your retirement, you elected (with spousal consent by Inez Watkins) Option B-50% Joint and Survivor Option for your spouse, Inez G. Watkins…. Our records indicate that this spouse, Inez Watkins, died on August 21, 2014[,] and you later married Bobbie F. Watkins on May 25, 2015. You and your current spouse, Bobbie, were not married on the date your pension payments commenced, July 1, 1991, and therefore, Bobbie does not satisfy the eligibility requirements [in the Plan] and no survivor pension benefit is payable to her.

(*Id.* at 9). Breon notified Watkins of his right to appeal this determination to the EAC/Pension Board. (*Id.* at 10).Watkins responded, by counsel, by letter dated June 24, 2016, in which counsel wrote, among other things:

12. There is a conflict between Option B, as signed by Loyd Watkins, and the 1950 Pension Plan, creating an ambiguity.

13. Since Option B included no provision for the spouse dying before the employee, Plaintiff should be entitled either to full pension or entitled to add his current spouse as a contingent beneficiary on his pension plan.

14. Loyd Watkins reasonably relied on the wording of Option B as presented to him at retirement.

(*Id.* at 13); (*see also* Watkins's Affidavit) ("I reasonably relied on Option B as

presented at the time I signed up for my pension.").[5]

The EAC/Pension Board met on December 7, 2016 to consider Watkins' appeal. (SAR at 14-16). Attorney Allenstein participated in that appeal meeting by phone. (*Id.*). On December 7, 2016, Attorney Allenstein submitted to the EAC/Pension Board by email an unsigned statement from Watkins, which was considered in deciding the appeal. (*Id.* at 14-18, 26).

According to the EAC/Pension Board, in relevant part:

At the December 7th meeting, the Committee heard Mr. Watkins' appeal regarding his request to replace his deceased spouse, Inez G. Watkins, with his current spouse, Bobbie F. Watkins, with respect to the survivor pension benefit elected by Mr. Watkins under The Goodyear Tire & Rubber Company 1950 Pension Plan (the "1950 Pension Plan"). The Committee has considered Mr. Watkins' appeal in light of the 1950 Pension Plan's terms and the administrative record.

Mr. Watkins retired from Goodyear-Gadsen (sic) with a pension benefit under the 1950 Pension Plan that commenced on July 1, 1991. He elected Option B – 50% Joint and Survivor Option as the form in which his benefit would be paid. The form of pension benefit required the consent of his spouse at the time, Inez G. Watkins, and the record reflects that Inez G. Watkins consented to this form of benefit. The record further reflects that Inez G. Watkins died on August 21, 2014,

---

[5] In his affidavit, Watkins says that he "was not given any information other than the form to sign" and "[i]f [he] had been informed that if [his] current wife died, there would be no contingent beneficiary and my pension would still be reduced, [he] would not have chosen Option B." (Watkins Affidavit at 1). As Watkins has not submitted any argument to the Court (and his complaint is devoid of the legal theory he believes entitles him to relief), he has not sufficiently raised an issue saying why this matters. Further, Watkins has not alleged that he actually requested a copy of the "instruments under which the plan is established or operated." *See* 29 U.S.C. §1024(b)(4).

and that Mr. Watkins married Bobbi (sic) F. Watkins on May 25, 2015.

Article V, section 2(c) of the 1950 Pension Plan states:

"Upon the Employee's death after his reduced pension has commenced or, if earlier, (i) after he has attained normal retirement age but before his retirement from the service of his Employer, or (ii) after his retirement under conditions entitling him to a pension under Paragraph 1 of Article III, his retirement after attainment of age 55 under conditions entitling him to a pension under Paragraph 3 of Article III or his termination of employment after attainment of age 55 under conditions entitling him to a pension under Paragraph 2 of Article III, monthly payments equal to one-half of the Employee's reduced pension shall be continued to his surviving spouse for the life of such surviving spouse; provided, that the Employee and such surviving spouse were married throughout the one-year period ending on the date of his death and were married on the date his pension payments commenced."

You have taken the position… that there is a conflict between Option B – 50% Joint & Survivor Option, as signed by [Watkins] on June 19, 1991, and the terms of the 1950 Pension Plan, and that an ambiguity is therefore created. You further claim that because Option B included no provision for the spouse dying before the employee, Mr. Watkins should be entitled either to a full pension or should be able to add his current spouse as a contingent beneficiary with respect to his pension benefits.

(*Id.* at 26) (emphasis omitted). Based on the Plan's terms and the facts, the

EAC/Pension Board found:

…The terms of the 1950 Pension Plan provide that a survivor benefit will be paid following the Employee's death only if the Employee was married to such spouse on the date his pension payments commenced. Mr. Watkins was not married to Bobbie F. Watkins on the date his pension payments commenced.

The terms of the 1950 Pension Plan provide no exception for payment

to any spouse other than the spouse of the Employee who was both married to the employee for the year preceding his death and was his spouse on the date his pension payments commenced. Inez G. Watkins was the spouse designated by Mr. Watkins for the purpose of the survivor benefit, and it is not possible under the terms of the 1950 Pension Plan, for any individual other than Inez G. Watkins to be the recipient of survivor benefits because she was the person married to him on the date his pension payments commenced.

(*Id.* at 27). Concerning Attorney Allenstein's ambiguity argument, the EAC/Pension

Board concluded:

> The Notice of Election of Optional Method of Pension Payment in which Mr. Watkins designates Inez G. Watkins as his contingent annuitant does not conflict with the terms of the 1950 Pension Plan because there is no mention in the Notice of any payment to any individual other than the designated Contingent Annuitant, who was Inez Watkins. In fact, paragraph (3) of Option B states that "After my death, (but only if my death occurs after the Option becomes effective) my spouse, Contingent Annuitant, shall receive monthly payments in an amount equal to one-half of such reduced amount as would have been paid to me had I been then living, with such payment to continue during the lifetime of my spouse." Inez G. Watkins was named as "Spouse" just a few lines below this statement. Further, the amount of the annuity under Option B was determined based on the joint lives of Mr. Watkins and Inez G. Watkins, according to a variety of actuarial assumptions, including life expectancy. It is not possible to substitute another life for the joint annuitant in this situation. An ambiguity is not created merely because Option B does not list every possible scenario with respect to a contingent annuitant and there is no conflict between the terms of the 1950 Pension Pan and the Notice of Election of Option B.

(*Id.*). Concerning Watkins' assertion that Goodyear had not explained Option B to

him well enough, the EAC/Pension Board found:

> The Company has a well-established process and procedures in place at Goodyear-Gadsen (sic) for explaining pension benefit options. The Committee found it more credible that the normal policies and procedures were followed at Goodyear-Gadsen (sic), than Mr. Watkins' claim that the options weren't explained to him at the time he elected Option B.

(*Id.*). Ultimately, concerning Watkins' appeal, the EAC/Pension Board concluded:

> The terms of the 1950 Pension Plan are clear in that only the spouse who was married to the Employee at the time his pension commences shall be entitled to the survivor benefit. To interpret the 1950 Plan any other way would create a benefit payment that is contrary to the terms of the 1950 Pension Plan. Therefore, the Committee finds that because Bobbie F. Watkins was not married to Mr. Loyd Watkins on the date his pension payments commenced, no survivor pension benefits will be payable to her following Mr. Watkins death, and the denial of such benefits is upheld. Further, the Committee finds that Mr. Watkins is not entitled to a refund of any amount attributable to the reduction in the monthly pension payment for the joint and survivor form of pension payment. Although Inez G. Watkins predeceased Mr. Watkins, the reduction for the joint and survivor option applies for the whole life of Mr. Watkins.

(*Id.* at 27-28). In its December 16, 2016 decision letter, the EAC/Pension Board informed Watkins that he could file suit under ERISA to seek judicial review of the final denial decision. (*Id.*). On February 20, 2017, based on the EAC/Pension Board's final denial of Watkins' appeal, Watkins filed suit in Etowah County Circuit Court, which the Plan then removed to this Court. (Doc. 1).

## III.  STANDARDS

### A.  Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)).

### B.  ERISA

ERISA does not contain a standard of review for actions brought under § 1132(a)(1)(B) challenging benefit eligibility determinations. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108-09, 109 S. Ct. 948, 953 (1989) ("Although it is a

'comprehensive and reticulated statute,' ERISA does not set out the appropriate standard of review for actions . . . challenging benefit eligibility determinations.").[6] Moreover, the case law that has developed over time governing such standards has significantly evolved. A history of the transformation of these principles is useful to understanding the presently applicable framework for evaluating § 1132(a)(1)(B) ERISA challenges.

In *Firestone*, the Supreme Court initially established three distinct standards for courts to employ when reviewing an ERISA plan administrator's benefits decision: "(1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the administrator discretion and the administrator has a conflict of interest." *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010) (citing *Buckley v. Metro. Life*, 115 F.3d 936, 939 (11th Cir. 1997) (discussing *Firestone*, 489 U.S. at 115)). In *Williams v. Bellsouth Telecomms., Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004), *overruled on other grounds by Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008), the Eleventh Circuit fleshed out the *Firestone* test into a six-step framework designed to

---

[6] ERISA provides "a panoply of remedial devices" for participants and beneficiaries of qualifying benefit plans. *Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985).

guide courts in evaluating a plan administrator's benefits decision in ERISA actions.

When the Eleventh Circuit created the *Williams* test, the sixth step of the sequential

framework required courts reviewing a plan administrator's decision to apply a

heightened arbitrary and capricious standard if the plan administrator operated under

a conflict of interest. *See id.* The Eleventh Circuit later modified this step in response

to the Supreme Court's ruling in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S.

105, 115-17 (2008), which concluded that a conflict of interest should be weighed

merely as "one factor" in determining whether an administrator abused its discretion.

*See Doyle v. Liberty Life Assur. Co. of Boston,* 542 F.3d 1352, 1359 (11th Cir. 2008)

("As we now show, *Glenn* implicitly overrules and conflicts with our precedent

requiring courts to review under the heightened standard a conflicted administrator's

benefits decision.").

The Eleventh Circuit's latest iteration of the *Firestone* standard-of-review

framework is found in *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350 (11th Cir.

2011), *cert. denied*, 132 S. Ct. 849 (2011):

> (1)  Apply the *de novo* standard to determine whether the claim
> administrator's benefits-denial decision is "wrong" (*i.e.*, the court
> disagrees with the administrator's decision); if it is not, then end the
> inquiry and affirm the decision.
>
> (2)  If the administrator's decision in fact is "*de novo* wrong," then
> determine whether he was vested with discretion in reviewing claims;

if not, end judicial inquiry and reverse the decision.

(3)   If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)  If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)  If there is no conflict, then end the inquiry and affirm the decision.

(6)  If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355.[7] All steps of the analysis are "potentially at issue" when a plan vests discretion to the plan administrator to make benefits determinations. *See id.* at 1356 n.7. Conversely, then, where a plan does *not* confer discretion, the court simply applies the *de novo* review standard established by the Supreme Court in *Firestone*. *See Firestone*, 489 U.S. at 115 ("[W]e hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.").

---

[7]  "In ERISA cases, the phrases 'arbitrary and capricious' and 'abuse of discretion' are used interchangeably." *Blankenship*, 644 F.3d at 1355 n.5.

## IV.  ANALYSIS

Goodyear moves for summary judgment by arguing that the EAC/Pension Board came to the right decision. (Doc. 15 at 17). Watkins replied to Goodyear; however his reply consisted of solely a statement of facts and two exhibits. (Doc. 16 at 1-4).[8] There is no argument section. (*See generally id.*). The Court will not fill in the gaps for Watkins. The Eleventh Circuit has stated that:

> We will not address this perfunctory and underdeveloped argument. *See Flanigan's Enters., Inc. v. Fulton County, Ga.*, 242 F.3d 976, 987 n. 16 (11th Cir.2001) (holding that a party waives an argument if the party "fail [s] to elaborate or provide any citation of authority in support" of the argument); *Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir.1987) (stating that an argument made without citation to authority is insufficient to raise an issue before the court).

*U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007). This makes sense because "[u]nder the adversary system . . . the Court does not serve as counsel's law clerk." *Federal Ins. Co. v. County of Westchester*, 921 F. Supp. 1136, 1139 (S.D.N.Y. 1996).

The first task for the Court to accomplish is to determine what exactly Watkins wants and how he intends to get there. His complaint, originally filed in state court,

---

[8]  Watkins filed a Motion for Extension of Time To File another response, but that request was too late and did not give a good cause for an extension of time. (Docs. 19, 20). However, just two days after the Court denied Watkins's request, in blatant disregard of the Court's decision, he filed another response anyway. (Doc. 21).

lacks specificity. (Doc. 1-1). It states that it is asking for equitable relief. (*See id.* at

1). It states that "[it] is governed by ERISA 29 U.S.C. §1132," but it gives no

indication of whether it is being brought under section (a)(1)(B) or (a)(3). (*See id.* at

6). The Complaint ends as follows:

> WHEREFORE, Plaintiff prays for equitable relief of either Loyd
> Watkins receiving his full pension after the death of his first wife, Inez
> Watkins, or alternatively allowing Loyd Watkins'[s] current wife to be
> the contingent beneficiary as requested by plaintiff.

(*Id.*). The fact that it is asking for equitable relief makes it seem as if the Complaint

is brought under (a)(3), but the fact that Watkins is asking for "his full pension"

makes it seem as if it is brought under (a)(1)(B). Goodyear seems to think it is

brought under (a)(1)(B). (*See* Doc. 15 at 18-23). That is a reasonable assumption, but

it is not entirely clear because the Complaint is so vague. The Court seriously doubts

this Complaint would have withstood a 12(b)(6) challenge and certainly not a 12(e)

motion. *See* FED. R. CIV. P. 12(b)(6), 12(e). Goodyear should have availed themselves

of these options and perhaps have avoided this litigation entirely. How the parties

were able to conduct discovery without actually knowing what precise theory

Watkins was proceeding on is beyond the Court's ability to speculate.

As far as the Court can tell, Watkins is attempting to bring some form of

equitable estoppel claim. This is a "very narrow common law doctrine." *See Jones v.*

*American General Life & Acc. Ins. Co.*, 370 F.3d 1065, 1069 (11th Cir. 2004) (citing

sources). It "is available where the plaintiff can show that (1) the relevant provisions

of the plan at issue are ambiguous, and (2) the plan provider or administrator has

made representations to the plaintiff that constitute an informal interpretation of the

ambiguity." *Id.* "'[A]mbiguity exists if the policy is susceptible to two or more

reasonable interpretations that can fairly be made, and one of these interpretations

results in coverage while the other results in exclusion.'" *Tippitt v. Reliance Standard*

*Life Ins. Co.*, 457 F.3d 1227, 1235 (11th Cir. 2006) (quoting *Shahpazian v. Reliance*

*Standard Life Ins. Co.*, 388 F.Supp.2d 1368, 1375 (N.D.Ga.2005)). "[E]quitable

estoppel is not available to plaintiffs in cases involving oral amendments to or

modifications of employee plans governed by ERISA because ERISA specifically

addresses these issues." *Kane v. Aetna Life Ins.*, 893 F.2d 1283, 1285 (11th Cir.

1990). However, it can apply to interpretations of an ERISA plan. *See id.* Since the

court in *Jones* applied §1132(a)(1)(B) to these sorts of claims, that is what the Court

will do here as well. *See Jones*, 370 F.3d at 1069.[9]

    The Court begins by evaluating this Motion under the *de novo* standard. As was

---

[9] Additionally, the Court notes that Watkins' primary requested relief is "receiving his
full pension." (*See* Doc. 1-1 at 6). This is a request for benefits, something that §1132(a)(1)(B) is
designed for. *See* 29 U.S.C. §1132(a)(1)(B). Further, "ERISA simply does not permit a plaintiff
to pursue an equitable claim when an adequate remedy to pay benefits exists." *Kirby v. American
United Life Ins. Co.*, No. 4:16-cv-776-VEH, 2016 WL 5118265, *4 (N.D. Ala. Sept. 21, 2016)
(Hopkins, J.).

stated, Watkins has to show that the Plan is ambiguous and that there was a representation about this ambiguity. *See Jones*, 370 F.3d at 1069. He fails on both counts.

First, the Plan is not ambiguous. As far as the Court can parse Watkins's response, it appears that his entire argument is that "[t]here is a conflict between Pension Plan Option Plan (Ex. 2) with Option B, as signed by Loyd Watkins, and Article V, Section 2(c) of the 2013-2017 Pension. (Ex. 2)." (Doc. 16 at ¶14). The Court does not find a conflict between Option B and Article V, Section 2(c). Option B is silent on whether a new spouse can be substituted in. (SAR at 4). To accept Watkins' argument would be to essentially say that every time the Plan provides more detail[10] to a notification of election it creates an ambiguity. That is a bridge the Court is unwilling to cross. To the extent both parties seem to agree that Article V controls, it merely gives further details to what is only a two-page notice.

Even if Article V did not control the outcome here, Watkins still has not shown that the Plan is ambiguous regarding whether he can substitute in a new spouse. The Court notes that the Plan has a provision whereby a contingent annuitant can be

---

[10] And, it is indeed more detail because the notification is silent on the issue as it pertains to Option B. This is different from a situation where the notification said that spouses could be freely substituted in, but the Plan had different terms. That is a conflict, not merely additional detail.

added or changed. (SAR at 52). Specifically, the Plan states that:

> After an Employee has elected . . . Option B . . . such Option may be changed, <u>or a different Contingent Annuitant designated</u>, only with the <u>consent of the Pension Board</u>.

(*Id.*) (emphasis added). Obviously, the Pension Board never consented to allow Watkins to add his new spouse as a "different Contingent Annuitant."[11] This makes sense when the following is taken into account. According to the Pension Board, the amount of the benefit Watkins (and his spouse upon his death) would receive is based upon "a variety of actuarial assumptions, including life expectancy." (SAR at 27). This is supported by the plain text of the Plan. (SAR at 51).[12] In other words, it appears to the Court that Goodyear paid Watkins benefits based on certain assumptions made back in 1991; changing the contingent annuitant could open them up to further payments over a whole new lifetime to a contingent annuitant that they

---

[11] Also obviously, Watkins knew about this requirement, since <u>he wrote and requested that consent.</u>

[12] The Plan states:

> If an Employee elects any of the foregoing Options, the actuarial value of all monthly payments to be made, after such Option becomes effective, to him, his Contingent Annuitant . . . shall be equivalent to the actuarial value, at the time such Option becomes effective, of the total amount of monthly pension which thereafter would have been payable under the Plan if no Option had been elected, taking into account the age of the Employee <u>and, where applicable, the age of his Contingent Annuitant</u>.

(SAR at 51) (emphasis added).

neither knew of, nor predicted, at the time Watkins elected Option B.

Second, Watkins has not raised a genuine issue of material fact as to whether a Plan representative gave an informal representation of the alleged ambiguity. His affidavit alleges that he was given the notice form to sign, and nothing else. (*See* Doc. 16-1 at 1). However, being given a form to sign to alert the company of the election of a plan is not being given an interpretation of a specific question regarding that Plan. Watkins later stated that "[w]hen this issue first came up, personnel at the union hall assured me that my second wife would be entitled to be added as a contingent beneficiary." (*Id.* at 2). However, there is no indication that "personnel at the union hall" are Plan representatives with some authority through which they can interpret the contractual provisions. Further, as far at the Court can tell, this issue first came up in 2014, <u>after</u> Watkins's first wife passed away. That means that even if people at the union hall were somehow Plan representatives (and assuming that relying on what they said was reasonable), Watkins cannot argue that he relied on their 2014 representations <u>when he elected Option B in 1991</u>. In conclusion, Watkins has failed to raise any developed argument to convince the Court that Goodyear was *de novo* wrong.

Even if Goodyear was *de novo* wrong, it is due to be affirmed under arbitrary and capricious review. The plan clearly grants the Pension Board discretion. (SAR

at 34) (granting the Pension Board "discretionary power and authority to interpret and construe the Plan and to resolve any disputes arising thereunder"). That means that the arbitrary and capricious standard applies. *See Blankenship*, 644 F.3d at 1355. Watkins has given the Court no reason that Goodyear's actions were arbitrary and capricious. (*See* Doc. 16 at 1-5). Accordingly, under the arbitrary and capricious standard, the decision of the Pension Board is due to be affirmed.

## V.    CONCLUSION

In conclusion, the Court **GRANTS** summary judgment to the Goodyear Pension Plan.

**DONE** and **ORDERED** this the 26th day of April, 2018.

**VIRGINIA EMERSON HOPKINS**
United States District Judge